**KALIPHARMA, INC., Plaintiff,**

v.

**BRISTOL–MYERS COMPANY, Defendant.**

**No. 88 CIV. 4640 (SWK).**

United States District Court, S.D. New York.

March 3, 1989.

Bass and Ullman by Milton A. Bass, Jacob Laufer, Peter T. Cobran, Dianne N. Crosson, New York City, for plaintiff.

Kenyon and Kenyon by Francis T. Carr, Edward W. Greason, Paul Lempel, James Galbraith, for defendant.

**MEMORANDUM OPINION AND ORDER**

KRAM, District Judge.

Plaintiff filed this action for declaratory judgment and injunctive relief on July 5,

1988 seeking a declaration that defendant's patent, U.S. Patent No. 4,504,657 (the "Bristol–Myers Patent"),[1] is invalid and an injunction enjoining defendant from asserting that plaintiff's activities infringed defendant's patent rights. Plaintiff claims that prior art, found in U.S. Patent No. 3,781,282 (the "Garbrecht Patent"), anticipated the claim in defendant's patent. Defendant served its answer on September 22, 1988, and raised as a defense lack of subject-matter jurisdiction based on a purported lack of "case or controversy" as required by Article III to the United States Constitution.[2] This action, originally filed under seal, is now subject to a protective order entered by Magistrate Sharon Grubin on November 15, 1988, and approved by Order of this Court on December 30, 1988 after consideration of the objections and responses filed by the parties. On January 27, 1989, defendant appeared before the Court *ex parte* seeking (1) an *ex parte* order allowing defendant to amend its answer to assert a counterclaim for infringement, and (2) an order to show cause for a hearing on a temporary restraining order (the "TRO") based on plaintiff's alleged imminent infringement of defendant's patent. The Court refused to sign the *ex parte* order granting leave to file an amended answer, and instructed counsel to proceed with notice to plaintiff. The Court also set down a hearing date for the proposed TRO.

The parties appeared on February 1, 1989, at which time the Court granted defendant leave to file its amended answer and granted the requested TRO.[3] The parties have submitted voluminous declarations and exhibits, along with memoranda of law, regarding defendant's application for a preliminary injunction enjoining plaintiff from making, using or selling the patent product in issue, an antibiotic known as crystalline cefadroxil monohydrate. The central issue before the Court is the validity of the Bristol–Myers Patent. Because of the complexities involved and the shifting focus of the parties' arguments, the Court will outline below the relevant facts and then, in general terms the arguments, presented by each side in each of their memoranda of law.

## BACKGROUND

Statement of Relevant Facts

1. The Parties

Kalipharma is a Delaware corporation, with its principal place of business in New Jersey, Complaint ¶ 2, and is engaged in the manufacture, marketing, distribution and sale of generic pharmaceutical products. Declaration of Samuel H. Gray, dated February 8, 1989 ("Gray Decl. I"), at ¶ 2, attached to Declarations in Opposition to Defendant's Motion for Preliminary Injunction submitted on February 9, 1989 ("Plaintiff's Declarations in Opposition"). In 1988, Kalipharma's sales in the United States reached approximately $41 million. *Id.* at ¶ 16. Bristol–Myers is a Delaware corporation, with its principal place of business in New York, and is a research-based pharmaceutical company. Declaration of Bruce R. Ross, dated January 25, 1989, at ¶ 5, attached to Defendant's Application for an Order to Show Cause submitted on January 27, 1989 ("Defendant's Order to Show Cause"). Approximately 20% of Bristol–Myers's business in the United States consists of the sales of prescription products, 35% of which are antibiotics. *Id.* at ¶ 6. Total net sales for Bristol–Myers exceeded $5 billion in 1987. Declaration of Samuel H. Gray, dated February 15, 1989, ("Gray Decl. II"), attached to Plaintiff's Reply Declarations in Opposition to Defendant's

1. A copy of the patent is attached to the Declaration of Paul Lempel, dated January 26, 1989, as Exhibit B.

2. Defendant did not list lack of subject-matter jurisdiction as a "defense" in its answer, but included the assertion in response to the first averment in plaintiff's complaint, which asserted jurisdiction. In retrospect, if defendant were serious that this Court did not have subject-matter jurisdiction, it should have moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), 12(c) or 56.

3. The TRO remains in effect through March 2, 1989 according to the terms of a Memorandum Opinion and Order issued by the Court on February 24, 1989.

Motion for a Preliminary Injunction, submitted on February 15, 1989 ("Plaintiff's Reply Declarations"). Crystalline cefadroxil monohydrate is described and claimed in the Bristol–Myers Patent, U.S. Patent No. 4,504,657. *Id.* at ¶ 7. This patent was issued by the United States Patent and Trademark Office on March 12, 1985 to Bristol–Myers, and contains one claim for crystalline cefadroxil monohydrate, described in terms of the x-ray diffraction properties of the compound. *See* Bristol–Myers Patent; *see also* Declaration of Edward P. Abraham, dated July 11, 1988, at ¶ 40, attached as Exhibit C to Defendant's Memorandum in Support dated February 11, 1989 ("Defendant's Memorandum in Support"). One of defendant's scientists, Professor Jon Clardy, tested a sample of the drug plaintiff intends to market, and concluded that this sample, identified as Sample T, was identical to the cefadroxil monohydrate claimed in defendant's patent based on the x-ray diffraction properties of each. Declaration of Jon Clardy, dated January 26, 1989 ("Clardy Decl. I"), at ¶¶ 6–9, submitted with Defendant's Order to Show Cause.

## 2. The Cefadroxil Monohydrate Market

The market for oral cephalosporins is highly competitive, and new drugs are being developed and marketed to supplant existing ones. Ross Decl. at ¶ 9. Defendant believes that the market for cefadroxil monohydrate will run its course approximately within the next five years. *Id.*

The principal antibiotic marketed by defendant is crystalline cefadroxil monohydrate under the trade names ULTRACEF and DURICEF, which had combined sales in the United States of $100 million for the year 1988. *Id.* at ¶¶ 6, 8. In 1987, defendant spent more than $1.7 million on product development for these two drugs. *Id.* at ¶ 12. Defendant's approximate expenses for research and development of cefadroxil monohydrate amount to $33 million, roughly half of which has been spent on continuing research since FDA approval in 1978. *Id.* Defendant employs a large support staff to visit doctors, pharmacists and hospitals in order to explain to them the characteristics of ULTRACEF and DURICEF. *Id.* at ¶¶ 13–15.

Defendant's president, Bruce Ross, claims that the introduction of a generic cefadroxil monohydrate would cost Bristol–Myers some $50 million in the first year alone, based on an anticipated loss of 30% to 50% of its sales. *Id.* at ¶ 20. Such a loss would cause Bristol–Myers to cease its research and development on new uses for cefadroxil monohydrate and eliminate the support staff services it offers to healthcare providers. *Id.* at ¶ 22. Kalipharma and IBI have expended approximately $1.5 million in investigating, researching, studying, testing and preparing to market its own cefadroxil monohydrate product in the United States. Gray Decl. at ¶ 12.

Plaintiff's president, Samuel Gray, states that generic drugs can be expected to capture 50% of cefadroxil monohydrate sales and that the generic price will be roughly 50% of the Bristol–Myers price. *Id.* at ¶ 13. Plaintiff stands to lose, based on its calculations, up to $25 million per year in potential sales if it is enjoined from marketing its cefadroxil monohydrate. *Id.* Even if plaintiff ultimately were to prevail, the delay in entering the market could cost it a large percentage of the generic market. *Id.* Kalipharma has announced the availability of 500 mg capsules of cefadroxil and has received at least one purchase order for its cefadroxil monohydrate. *See* Exhibits G and J to Lempel Decl.

## 3. The Patent Prosecution

Crystalline cefadroxil monohydrate is a particular form of an oral cephalosporin antibiotic useful in combatting bacterial diseases, *see* Bristol–Myers Patent, and it has a unique crystalline structure detectable by x-ray analysis. Abraham Decl. at ¶ 40 and n. 21. This particular antibiotic has a longer half-life than other cephalosporins, allowing it to be administered only once or twice daily, as opposed to four times daily. Abraham Decl. at ¶ 41. Other features make cefadroxil monohydrate more clinically useful than other cephalosporins, Declaration of George A. Pankey,

dated July 26, 1988, at ¶ 7, attached as Exhibit B to Defendant's Memorandum in Support, which as a general rule are safer than penicillins. *Id.* at ¶ 5.

Daniel Bouzard, Abraham Weber and Jacques Stemer (the "applicants") filed an application in the United States on August 7, 1978 for a patent for a single claim to the cefadroxil monohydrate in question.[4] Patent Examiner Mark Berch rejected the application on April 17, 1979 as being fully anticipated by the Garbrecht Patent and Example 7 in particular. *See* Exhibit 3 to Plaintiff's Memorandum of Law in Opposition. The Patent Examiner rejected the applicants' contention that the Garbrecht Patent did not indicate that cefadroxil monohydrate was recovered in crystalline form. He determined that since the applicants' product "had *in fact* been prepared before, using the same method and for the same purpose (production of high purity antibiotic) it cannot be considered 'new' (35 USC 101)." *Id.* (emphasis in original). He commented that even if the Garbrecht material had a different crystalline form, "such a change in habit is *not* a patentable difference, unless the new form has properties not residing in the old form." *Id.* (emphasis in original).

The applicants challenged this ruling by arguing that Example 7 of the Garbrecht Patent was only a "paper" example that taught nothing about the product formed and that Garbrecht did not indicate that cefadroxil had been recovered in crystalline form. *See* Appeal Brief before the Board of Appeals, received March 7, 1980, in the File Wrapper, at 12–13, 17. They also argued that the Garbrecht Patent did not inherently produce their product, that their process differed significantly from that used by Garbrecht and that the Patent Examiner incorrectly presumed that the ultimate products would be the same. *Id.* at 15–16.

The applicants also presented an argument to the Board of Examiners based on a "seeding" phenomenon. In their brief, applicants describe the nature of crystallization and the seeding phenomenon, though the references in the brief are not attached as indicated. They state first that "[c]rystalline substances are solids containing their constituent atoms in an orderly, repeating arrangement. * * * A given arrangement would characterize a particular solid from (sic) of a given substance." Appeal Brief at 6. They then explain that, according to Ostwald's Law, chemical compounds crystallize first in the least stable form and then proceed through various intermediate stages of stability until the most stable form is isolated. *Id.* at 8. They then assert that "because of seeding and the 'polution' (sic) of an environment with a more stable form it can become impossible to subsequently reproduce a prior known, more metastable, crystalline form." *Id.* Based on this theory, the applicants contested that they could not attempt to repeat Example 7 because even if they did recover the crystalline cefadroxil monohydrate of their application, it would be due to seeds of their own compound in the environment. *Id.* at 11.

Weber explains in his declaration attached to the Appeal Brief that he had isolated two other crystalline forms of cefadroxil before isolating the form claimed in the application. He labelled the first form "old cefadroxil monohydrate", the second form "cefadroxil trihydrate", and the third form, the one for which he sought the patent, "new cefadroxil monohydrate". Declaration of Abraham Weber, dated August 1, 1979, at ¶ 3, in File Wrapper. Based on his evaluation of the available x-ray crystallographic data, he concluded that each of these cefadroxils "are different and distinct crystalline entities." *Id.* at 8. He concluded that the new cefadroxil monohydrate was "apparently ... the more thermodynamically stable form." *Id.* Once he produced the new cefadroxil monohydrate, it became impossible to reproduce cefadroxil trihydrate in his laboratory because of the presence of crystal seeds of the new cefadroxil monohydrate. Declaration of Abraham Weber, dated June 10, 1980 ("Weber Decl. II"), at ¶ 5, in the File Wrapper.

---

**4.** This information is garnered from the File Wrapper filed by plaintiff.

The applicants compared the Garbrecht process for Example 7 with a prior experiment performed by Weber, referred to as Exhibit IV.[5] They claimed that this Exhibit IV was very similar to the Example 7, except for the manner in which the dimethylformide ("DMF") solvate was made. The Exhibit IV experiment was performed in 1973 before the production of new cefadroxil monohydrate. Weber Decl. II, at ¶ 5. The Exhibit IV experiment originally yielded cefadroxil trihydrate, but once the new cefadroxil monohydrate had been produced, the same experiment yielded only new cefadroxil monohydrate and cefadroxil trihydrate could not be recovered. *Id.*

The Board of Appeals adopted the decision of the Patent Examiner *"in toto"*. Appeal Decision, dated (as mailed on) January 19, 1982, attached as Exhibit 5 to Plaintiff's Memorandum in Opposition. The Board added:

> (1) While Garbrecht does not expressly describe the product of ... Example 7 as crystalline, in our view he clearly obtains a crystalline product ...
>
> \*    \*    \*    \*    \*    \*
>
> (2) We find nowhere in the record a clear statement that the direct comparison vis-a-vis Garbrecht, called for by the Examiner to refute his "inherency" position, was or is scientifically impossible to make. All we find by way of actual evidence is the assertion ... that "it is now impossible to prepare cefadroxil *tri*hydrate ... in *his* laboratory and pilot plant" (emphasis added). Indeed, the statement in the same Declaration ... that the Garbrecht method applied to the solvate complex resulted in Appellants' claimed compound, would appear to support rather than refute the Examiner's position as to inherency.

The applicants filed a "continuation" on March 16, 1982, and submitted additional declarations in support of its arguments that Garbrecht did not anticipate the claimed "new cefadroxil monohydrate". Professor Ronald G. Micetich, with Ph.D in Organic Chemistry and experience in the field of beta-lactam antibiotics, including

cephalosporins, attempted to reproduce the Garbrecht procedures in his laboratory at the University of Alberta in Canada. He describes the Garbrecht Patent as involving a two-step process. A cephalosporin DMF complex is produced, and then this complex is treated so as to cause the cephalosporin to liberate from the DMF complex, resulting in the precipitation of a crystalline hydrate. Declaration of Ronald G. Micetich, dated August 31, 1982 ("Micetich Decl. I"), at ¶ 3. After five separate experiments, he claims that he could not prepare cefadroxil DMF solvate by repeating the instructions of Example 7 of the Garbrecht Patent, and from this fact he states that it "necessarily follows" that the crystalline cefadroxil monohydrate cannot be prepared. *Id.* at ¶ 11.

On January 28, 1983, Patent Examiner Berch rejected this second application under 35 U.S.C. § 102(b) as anticipated by Example 7 of the Garbrecht Patent. He criticized Micetich for not going to greater lengths to remove certain chemical groups in the processing of the experiment. He noted that the conventional method for removing the t-butoxicarbonyl (t-BOC) group is through the use, not only of aqueous hydrochloric acid, but also triflouroacetic acid or formic acid. The Patent Examiner noted that the Board of Appeals had rejected Weber's seeding theory and he himself criticized Weber's conclusions.

The applicants did not end their efforts, but instead pressed forward with a request for reconsideration. They argued that the Patent Examiner conceded that the claimed invention was not "obvious" pursuant to 35 U.S.C. § 103 and that the Garbrecht example could only be replicated with certain modifications known to those with ordinary skill in the art. They stressed that they were not claiming an invention for cefadroxil, but for a new and unobviously superior crystalline form, and that the lack of marketing by Garbrecht or anyone else of the claimed prior art suggests that the claimed new cefadroxil monohydrate was not anticipated. Applicants submitted a

---

**5.** Results from this experiment are attached to      Weber's August 1, 1979 declaration.

second declaration by Professor Micetich, in which he described a number of experimental variations in an attempt to remove the ester and BOC groups. He concluded that, although he was able to recover cefadroxil, it was not the new cefadroxil monohydrate claimed in the patent application. Declaration of Ronald Micetich, dated June 29, 1984 ("Micetich Decl. II"). In further support of the Micetich conclusions, Professor Ilya Prigogine, experienced in statistic mechanics and thermodynamics, concluded that,

> in view of the fact that cefadroxil had not previously been prepared in Professor Micetich's laboratory, the environmental conditions under which Professor Micetich performed his work were such as to favor the production of a crystalline form of cefadroxil that represents the results that would have been obtained by one reproducing Garbrecht Examples 7, 1 and 5 under the environmental conditions in the early 1970's.

Declaration of Ilya Prigogine, dated June 18, 1984, at ¶ 7, in the File Wrapper. Examiner Berch then approved the application, and the Patent was issued on March 12, 1985. The reasons for approving the patent are not enclosed in the File Wrapper, though the Notice of Allowability recites that a statement of reasons was attached. The Notice does state, however, that the claim was allowed in view of applicants' communications dated July 11, 1984 and September 13, 1984. Counsel's Supplemental Reply and Request for Reconsideration on behalf of applicants is dated July 10, 1984; the second Micetich declaration and the Prigogine declaration are appended. A cover letter indicating that a formal drawing of the application was enclosed is dated September 13, 1984. The Court concludes that the final approval was based on these documents.

4. The Challenge to Validity

a. *Flaws in Micetich's Procedure*

Plaintiff challenges the validity of Professor Micetich's conclusions, upon which the Patent Examiner granted the Bristol–Myers Patent, that the Garbrecht Patent could not be followed to reproduce the "new" cefadroxil monohydrate. Professor Alvin Kosak, who specializes in heterocyclic organic chemistry, declared that Dr. Micetich did not use sufficient quantities of hydrochloric acid ("HCl") in performing the Garbrecht Patent, and that this deficiency caused the experiment to fail. Declaration of Alvin I. Kosak, dated February 7, 1989 ("Kosak Decl. I"), at ¶ 9, attached to Plaintiff's Declarations in Opposition. Specifically, Kosak noted that the cefadroxil produced was modified by two protecting groups and that Micetich failed to adjust to the presence of the second protecting group by not adding more HCl. *Id.*

Professor Bernard R. Belleau, who has extensive experience in pharmaceutical chemistry, states that the analytical procedures described by Micetich are "appropriate and reliable methods" and that the experimental work described by Micetich "represents the range of the variations, modifications or alterations of Examples 1, 5 & 7 of the '282 patent [the Garbrecht Patent] which would have been suggested to or considered by one of ordinary skill in the art ..." Declaration of Bernard R. Belleau, dated July 19, 1988, at ¶¶ 11–12, attached as Exhibit I to Defendant's Memorandum in Support. He does not respond specifically to the challenge by Kosak, but merely gives Micetich his stamp of approval.

b. *Actual Reproduction of the Garbrecht Patent*

Plaintiff claims to have obtained the "new" cefadroxil monohydrate claimed in the Bristol–Myers Patent by repeating, with certain obvious modifications, Example 7 of the Garbrecht Patent. Plaintiff's business affiliate, Instituto Biochimico Italiano ("IBI"), under the supervision of Paolo M. Farina, who has a doctorate in industrial chemistry, attempted to reproduce the Garbrecht Patent in its laboratories in Milan and claims to have succeeded. Farina Declaration, dated March 31, 1988, attached to Plaintiff's Declarations in Opposition. Farina used more HCl than called for in the Garbrecht method Example 1, since the amount specified would not in his opin-

ion be sufficient for hydrolysis of both the ester group and the BOC group.[6] He thus used a larger concentration of 5 parts HCl to each part zinc as described in Garbrecht Example 2. *See* IBI Report at 4, 11. He also increased the temperature from the specified 20°C to 55°C in order to increase the ultimate yield of cefadroxil. *Id.* at 4–5. Professor Giancarlo Jommi, an organic chemist at the University of Milan, reviewed the IBI report and concluded that the modifications made are "obvious and only marginal for a person with some experience in Organic Chemistry" and that Example 7 could be repeated to obtain crystalline cefadroxil monohydrate. Declaration of Giancarlo Jommi, dated October 23, 1987, at ¶¶ 3–4, attached to Plaintiff's Declarations in Opposition.

In a second experiment in October, 1987 at a laboratory at the University of Bologna, Professor Gianfranco Cainelli, an organic chemist with experience in beta-lactam antibiotics, repeated the experiment performed by Farina and obtained the same results. Cainelli confirmed that Farina's deviation in experimental procedure from that described in the Garbrecht Patent example 7 "are to be considered obvious and not important for a person working in the field of beta-lactam antibiotics." Cainelli Declaration, dated October 28, 1987, at ¶ 4, attached to Plaintiff's Declarations in Opposition. The experiment was repeated a third time by Dr. Farina on November 16–17, 1987, with similar result. Declaration of Samuel H. Gray, dated February 8, 1989, at ¶ 6, attached to Plaintiff's Declarations in Opposition.

Professor Samuel J. Danishefsky, a synthetic organic chemist who is "very familiar" with beta-lactam chemistry, concludes that the IBI reports fail to establish that the Garbrecht Patent could produce cefadroxil monohydrate. Declaration of Samuel J. Danishefsky, February 10, 1989, at ¶ 4. Danishefsky believes that IBI's purification of the chemical intermediate by silica

gel chromatography, a procedure not described in Example 7 of the Garbrecht Patent, constituted a "radical departure ... which precludes the IBI work from claiming to be a reproduction of the Garbrecht patent." *Id.* at ¶ 5. Danishefsky also disagrees with IBI's use of additional hydrochloric acid to "remove blocking groups". He states that the use of other types of acids is more appropriate under the circumstances, *id.* at ¶ 8, that the Garbrecht Patent did not call for the levels of hydrochloric acid used by IBI, *id.* at ¶ 11, and that the use of higher temperatures by IBI constituted a departure from Garbrecht, *id.*

Professor Kosak, in a second declaration, challenges Professor Danishefsky's attack on IBI's use of silica gel chromatography. Kosak first notes that a "person of ordinary skill in the art performing Garbrecht Example 7 would know that purification of intermediate products is desirable before proceeding to the next step in the process. The use of silica gel chromatography for the purification of organic materials is a method which has been known since at least the 1940's and would certainly have been obvious to any person of ordinary skill in the art performing Garbrecht 7." Declaration of Alvin I. Kosak, dated February 14, 1989 ("Kosak Decl. II"), at ¶ 3, attached to Plaintiff's Reply Declarations. Professor Kosak, who reviewed the laboratory notes of Professor Micetich's experiments, states that Micetich used the same silica gel column chromatography used by Dr. Farina at IBI and for the same purification purposes. *Id.* at ¶ 6. Kosak concludes that this purification technique, used by two scientists years apart and without the knowledge of the other, is one that a person of ordinary skill in the art would use under these circumstances. *Id.* at ¶ 7.[7]

Kosak also challenges Danishefsky's conclusions regarding Dr. Farina's use of hydrochloric acid and higher temperatures. *See id.* at ¶¶ 8–11. He restates that Example 7 involved two protecting groups,

---

**6.** Example 7 stated that the procedures described in Example 1 should be used for deprotection of these groups.

**7.** Faced with this obvious contradiction, defendant has withdrawn the testimony of Professor Danishefsky, at least as it concerns the challenge to IBI's use of silica gel column chromatography as a purification technique.

whereas Example 1 only involved one.[8] He asserts that "removal of two protecting groups requires more reagent than would be used for the removal of one protecting group. Additionally, ... it is customary to employ a significant excess of reagent above the calculated so-called 'stoichiometric' amount." (citation omitted). *Id.* at ¶ 9. Although Kosak recognizes that anhydrous acids such as triflouroacetic acid and formic acid are frequently used to remove a BOC protecting group, a person of ordinary skill in the art would first attempt to vary the amounts of reagents suggested directly in the experiment. *Id.* at ¶ 10. He thus concludes that the proper procedure would be first to vary the amounts of HCl:Zn and then attempt to remove the protecting groups with other reagents. Kosak also notes that the increased temperature used by Farina was not a departure from standard procedure. *Id.* at ¶ 11. He notes that Farina obtained cefadroxil monohydrate by using the specified temperature of 20°C, and then increased the temperature only to increase the yield. As he put it, "increasing the temperature for the purpose of speeding up the reaction and improving the yield is in any event a standard procedure obvious to one skilled in the art and is in no sense a significant departure from the Garbrecht patent." *Id.*

### c. *Identity of the Garbrecht and Bristol–Myers Materials*

Professor Alessandro Coda, at the behest of plaintiff, compared the x-ray diffraction pattern of the cefadroxil monohydrate described in the Bristol–Myers Patent with the diffraction pattern of the cefadroxil monohydrate produced in accordance with IBI's own patent, U.S. Patent No. 4,625,-021. This "IBI Patent" appears to be a high-yield process for producing cefadroxil monohydrate. Coda also compared the diffraction patterns of the IBI material with the Garbrecht Patent material. *See* Declaration of Alessandro Coda, dated March 9, 1987, attached to Plaintiff's Declarations in Opposition. Professor Seymour Z. Lewin,

also at plaintiff's request, reviewed the work of Professor Coda and concluded that the data demonstrate "that there is no objective material difference in the x-ray diffraction patterns he found for the Garbrecht Example 7 sample, the IBI sample and the reported data for the Bristol patent at issue in this litigation." Declaration of Seymour Z. Lewin, February 6, 1989, at ¶ 4, attached to Plaintiff's Declarations in Opposition. He noted that any differences between the IBI sample data and the Bristol–Myers data were within the limits of instrumentational and analytical tolerances. *Id.*

Professor Clardy reviewed the test results obtained by Professor Coda and concluded that the "material made in accordance with the Garbrecht patent is different from the crystalline cefadroxil monohydrate material described in Bristol–Myers patent." Declaration of Jon Clardy, dated February 1, 1989 ("Clardy Decl. II"), at ¶ 4, submitted on February 9, 1989. He also concluded that "the material made in accordance with the IBI patent is different from the crystalline cefadroxil monohydrate material described and claimed in the Bristol–Myers patent." *Id.* at ¶ 5. Clardy expressed his opinion that the IBI material and the Garbrecht material are identical. *Id.* at ¶ 7. He concludes that the Coda report presents data that establishes that the Garbrecht Patent material is not the same as the Bristol–Myers Patent material. *Id.* at ¶ 8.

Samuel H. Gray, the president and chief executive officer of Kalipharma states that Kalipharma has never produced cefadroxil monohydrate, that it has received all its cefadroxil monohydrate from IBI and that the sample provided to Bristol–Myers came from the cefadroxil monohydrate provided by IBI. Declaration of Samuel H. Gray, dated February 15, 1989 ("Gray Decl. II"), at ¶ 3, attached to Plaintiff's Reply Declarations. Dr. Enrico Bosone, who served as assistant to the general manager of IBI through November, 1988, and who is now

---

**8.** Kosak states that Example 2 only involved one protecting group as well, but the Court notes that according to Farina's table at page 11 of his report, Example 2 called for a 5:1 stoichiometric ratio of HCl:Zn.

IBI's Deputy Manager for Regulatory Affairs, states that all the cefadroxil monohydrate supplied to Kalipharma and to Professor Coda was produced in accordance with the IBI Patent, U.S. Patent No. 4,625,-021. Declaration of Enrico Bosone, dated February 14, 1989, at ¶ 6, attached to Plaintiff's Reply Declarations.

Professor Lewin, after reviewing Professor Clardy's declarations, states that Clardy's conclusion that Sample T is the same as the Bristol–Myers product on the one hand, and his conclusion that the Kalipharma/IBI product is different than the Bristol–Myers product on the other hand, is scientifically insupportable. Declaration of Seymour Z. Lewin, dated February 14, 1989 ("Lewin Decl. II"), at ¶ 8, attached to Plaintiff's Reply Declarations. Lewin criticized Clardy for disregarding minor variations in the intensities and angular measurements between Sample T and those in the Bristol–Myers cefadroxil monohydrate, while subsequently giving great weight to similar and no greater differences in intensities and angular measurements between the IBI sample and the Bristol–Myers sample. *Id.* at ¶ 5. He also noted that Coda compared the IBI Standard, a composite of 30 samples, against the published, and less precise, data of the Bristol–Myers Patent. As such, the conclusions to be drawn from this comparison must reflect this inherent difference. *Id.* at ¶ 6. Lewin prepared a number of tables, attached as Exhibit 3 to his declaration, that compare the diffraction peak d-value positions for the various samples of cefadroxil monohydrate discussed. These tables indicate that the variances in the peak d-values all fall within the expected experimental variances. *See id.* at ¶ 9.

Clardy, after reviewing the declarations of Professor Lewin and Professor Coda's data, states that

it is now my opinion that I cannot reach a conclusion as to whether the "Garbrecht pattern" is or is not the same as the x-ray powder diffraction pattern in the

Bristol–Myers Patent No. 4,504,657. The same is true with respect to the diffraction patterns of the material made by IBI in accordance with the process described in IBI Patent No. 4,625,021 when compared to the Bristol–Myers patent.

Declaration of Jon Clardy, dated February 20, 1989 ("Clardy Decl. III"), at ¶ 2(a), attached as Exhibit A to Defendant's Response to Plaintiff's Reply, submitted on February 21, 1989. Clardy stands by his conclusion stated in Clardy Decl. I that Sample T is identical to the Bristol–Myers product, since he personally conducted that experiment. Clardy Decl. III at ¶ 5.

d. *The Seeding Theory*

Defendant submitted, somewhat belatedly, the testimony of Professor William Nunn Lipscomb, Jr., a chemical crystallographer who received the Nobel Prize in Chemistry in 1976. Appended to his declaration is approximately sixty pages of hearing testimony that Professor Lipscomb gave in another action at which the validity of the Bristol–Myers patent for cefadroxil monohydrate is at issue. *Biocraft Laboratories, Inc. v. Bristol–Myers Company,* No. 89 Civ. 0158 (DRD), pending before Judge Debovoise in the United States District Court for the District of New Jersey.[9] In his own words, he "generally testified about the phenomenon wherein in certain instances a less stable crystallline (sic) form of a crystalline material transforms into a more stable crystalline form, and the earlier, less stable form can no longer be obtained." Declaration of William N. Lipscomb, Jr., dated February 21, 1989, at ¶ 3. He testified, again in his own words, "about a description in the literature wherein the phenomenon appeared to be universal in the sense that the less stable material could no longer be made even in another area of the world." *Id.* at ¶ 4. This "universal" seeding might occur by the distribution of very small seeds, perhaps as small as 100 molecules, that act as crystallization templates preventing the crystallization of less stable forms. *Id.* at

---

9. In an oral opinion, Judge Debovoise granted defendant's application for a preliminary injunction on February 24, 1989. Defendant has provided the Court with a copy of the transcript of the opinion.

¶ 5. Professor Lipscomb testified about this phenomenon generally and did not comment on the specific experiments at issue in the present case.

Outline of Arguments

When defendant first sought the TRO, it argued that its patent was valid due to (1) the statutory presumption of validity attached to existing patents pursuant to 35 U.S.C. § 282, and (2) the conclusion by Professor Clardy that the Kalipharma product submitted to him, identified only as Sample T, was identical to the Bristol–Myers product, based on comparisons of the X-ray powder diffraction properties of each sample. Clardy Decl. I, at ¶¶ 6–9.

Plaintiff opposed the preliminary injunction on the grounds (1) that there were serious flaws in the scientific evidence presented by Professor Micetich to the patent examiner, evidence which purports to show that the teachings in a prior patent, the Garbrecht Patent, cannot be replicated by a person of ordinary skill in the art to produce the claimed form of cefadroxil monohydrate, (2) that plaintiff had in fact successfully replicated Example 7 of the Garbrecht Patent so as to produce cefadroxil monohydrate, and (3) that the material produced according to the terms of the Garbrecht Patent is the same as that produced by the Bristol–Myers Patent.

Defendant replied to these arguments by contending (1) that the original evidence presented to the patent examiner was valid and that accordingly the Garbrecht Patent could not be replicated, (2) that the cefadroxil monohydrate produced by plaintiff's IBI, purportedly according to the terms of the Garbrecht Patent, is different in a significant manner from the Bristol–Myers Patent according to plaintiff's own scientist, Professor Alessandro Coda, and thus, the Garbrecht Patent does not anticipate the Bristol–Myers Patent, and (3) that plaintiff did not in fact reproduce cefadroxil monohydrate using the technique taught in the Garbrecht Patent.

Plaintiff replied to these arguments by contending (1) that plaintiff did replicate the Garbrecht Patent using state of the art techniques reasonably known to a person of ordinary skill, and in particular that Micetich, who presented the experimental data to the patent examiner at the time defendant received its patent, used the same techniques now challenged by defendant, and that (2) defendant has argued itself into a knot by claiming initially that plaintiff's IBI cefadroxil monohydrate was identical to the Bristol–Myers product, in support of its infringement argument, and then later arguing that the evidence demonstrated that plaintiff's IBI cefadroxil monohydrate was indeed different than the Bristol–Myers product, in support of its argument that plaintiff had not replicated the Garbrecht Patent material.

Defendant then replied to these arguments by contending (1) that plaintiff has itself twisted the evidence by asserting that it reproduced the Garbrecht Patent, which plaintiff argues establishes a prior art for the Bristol–Myers product, while the scientist who conducted the experiment, Professor Coda, concluded that plaintiff's product was distinct in certain ways from the Bristol–Myers product, (2) that defendant's scientist, Professor Clardy, withdraws his argument that the IBI material and the Garbrecht sample, are not the same as the Bristol–Myers product, and (3) that to the extent that plaintiff actually did reproduce the Garbrecht material, it did so because (a) the process used to obtain the material was modified to such an extent that it cannot fairly be considered a reproduction of the prior art, and/or (b) the local atmosphere in the laboratories used by plaintiff's scientists contained "seeds", or "templates", of the Bristol–Myers product, which in turn made it possible to reproduce the Garbrecht process to produce the cefadroxil monohydrate made by Bristol–Myers.

Plaintiff strenuously objected to the late submission of new theories and declarants.[10] Plaintiff argued, with regard to the

---

**10.** Although the Court will not completely disregard the declaration of Professor Lipscomb, who presented the seeding theory, the Court

notes that plaintiff is extremely anxious for a resolution of the preliminary injunction application and will therefore not be submitting fur-

substance of the submissions (1) that the recantation by Clardy of his earlier declarations evidences the falsity of his earlier declarations,[11] (2) that defendant's argument that Coda's work demonstrates that the Kalipharma/IBI product and the Bristol–Myers product are materially different completely undermines defendant's contention that plaintiff has or will infringe defendant's patent,[12] (3) that defendant has abandoned the Danishefsky declaration to the extent that it challenged the IBI experimenters' use of silica gel column chromatography, and (4) that defendant's seeding theory should be rejected because (a) it constitutes "injunction by ambush", being introduced so late in these expedited proceedings, (b) the testimony comes from another action and does not contend with the specific experiments performed by plaintiff in this case, (c) the theory is speculative, (d) the patent examiner rejected the seeding theory as a basis for not attempting to reproduce the Garbrecht patent, (e) defendant did attempt to repeat the experiment in an uncontaminated laboratory and claimed that it could not be replicated, and (f) plaintiff replicated the Garbrecht example through Professor Cainelli's laboratory at the University of Bologna where cefadroxil had not previously been produced.[13]

## DISCUSSION

### Preliminary Injunction Standard

The Patent Act, 35 U.S.C. § 1 *et seq.*, gives inventors the exclusive right to "exclude others from making, using or selling the invention...." 35 U.S.C. § 154. The Court has the power to enjoin "the violation of any right secured by patent, ..." 35 U.S.C. § 283. In a patent case, the Court must consider four factors in determining whether to issue a preliminary injunction: (1) a reasonable likelihood of success on the merits, (2) irreparable harm, (3) a balance of hardships in favor of the party seeking the injunction, and (4) the impact of the injunction on the public interest. *T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equip.*, 821 F.2d 646, 647 (Fed.Cir. 1987). No single factor is dispositive, and the Court must balance each against the others. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988). The substantive patent law of the Federal Circuit, as opposed to the Second Circuit, controls in this action. *Id.* at n. 12. The issuance of an injunction lies within the discretion of this Court. *Id.*

### Likelihood of Success on the Merits

#### 1. Legal Discussion

In a patent action, "a patent holder must establish a likelihood of success on the merits both with respect to validity of its patent and with respect to infringement of its patent." *Id.* While the parties do not question this principle, they disagree as to which party has the burden of establishing the validity or invalidity of the patent for purposes of the pending application for preliminary injunctive relief. Normally, the party seeking injunctive relief has the burden of clearly establishing the necessary elements, including patent validity. *Atlas Powder Co. v. Ireco Chemicals*, 773

---

ther memoranda of law or declarations. The Court will give these latest submissions the weight it views appropriate under these circumstances.

**11.** Specifically, plaintiff notes that none of the data has changed, only Clardy's interpretation of it. Plaintiff states that Clardy did not know that the Kalipharma sample he originally tested, Sample T, *is the same material* as the sample discussed by Coda and later commented upon by Clardy. Plaintiff then surmises that Clardy had to withdraw his earlier statements once he discovered that the materials were actually the same.

**12.** Plaintiff argues first that it is Professor Clardy who concludes, based on the Coda data, that Coda found plaintiff's product and the Bristol–Myers product to be different. Plaintiff then points out that its Professor Lewin, after reviewing the same Coda data, explains that Clardy's conclusions are faulty and that there are no material differences between the plaintiff's product, the Garbrecht sample produced by plaintiff's scientists and the Bristol–Myers product. Lewin also states that even if the differences identified by Coda were significant, they are not so significant as to warrant the issuing of a new patent to defendant.

**13.** *See* Declaration of Gianfranco Cainelli, dated February 14, 1989, at ¶ 3, attached to Plaintiff's Reply Declarations.

F.2d 1230, 1233 (Fed.Cir.1985). The *Atlas Powder* court specifically stated that the moving party need not establish that the patent is valid "beyond question", *id.* a standard advocated by plaintiff and earlier case law. *See Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578 (Fed.Cir.1983) (citations omitted). Pursuant to statute, a patent is presumed valid and the party challenging a patent has the burden of establishing invalidity. 35 U.S. C. § 282. The Federal Circuit has stated that

> the party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima facie case, but the burden of persuasion on the merits remains with that party until final decision.

*Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983). Once the challenging party presents a prima facie case of invalidity, the burden of production shifts to the patentee to come forward with rebutting evidence, though the burden of persuasion always remains with the challenging party. *Cable Elec. Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1022 (Fed.Cir.1985).

This burden exists at the trial on the merits. At the preliminary injunction stage, where a patentee seeks a preliminary injunction and the resisting party challenges the patent's validity, the moving party, here defendant, must demonstrate a reasonable likelihood that the challenging party, here plaintiff, will fail to meet its burden at trial of proving by clear and convincing evidence that the patent is invalid. *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987). Defendant does not have to prove that its patent is valid, only that plaintiff is not likely to prove that the patent is invalid.

The parties have concentrated their arguments on the narrow issue of anticipation. "An inventor is not entitled to a patent if the invention was anticipated by prior art or, as of the time it was made, would have been obvious to a person having ordinary skill in that art." *Lam, Inc. v. Johns–Manville, Corp.,* 668 F.2d 462, 468 (10th Cir.), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982). In the present case, the prosecution history indicates that, although obviousness was once raised as a basis for denying the application, the Patent Examiner decided that Garbrecht anticipated the invention of "new" cefadroxil monohydrate. The Patent Examiner ultimately allowed the patent after considering Micetich's second declaration in which he stated that he could not obtain "new" cefadroxil monohydrate by following the teachings of Garbrecht. A claimed invention is anticipated under 35 U.S.C. § 102 by "disclosure in a single prior art reference of each element of the claim under consideration." *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1105 (Fed.Cir.1986). "In the case of chemical compounds, the mere recitation of a structural formula is insufficient to be an anticipation: the disclosure must also recite means of preparing the compound and at least one significant useful property." *Warner–Jenkinson Co. v. Allied Chemical Corp.,* 477 F.Supp. 371, 383 (S.D.N.Y.1979), *aff'd mem.,* 633 F.2d 208 (2d Cir.1980).

## 2. Resolution of Factual Disputes

■ The central issue in the present case is whether proper application of the Garbrecht Patent in an uncontaminated environment would yield the cefadroxil monohydrate of the Bristol–Myers Patent. Plaintiff claims that Garbrecht Example 7 yields cefadroxil monohydrate and that Micetich was incorrect in concluding that it did not. In its latest submission, defendant states its argument in two parts. First, defendant argues that plaintiff's own evidence by Professor Coda demonstrates that the Garbrecht sample produced by IBI and the Bristol–Myers material are different. Second, and in the alternative, if the Court concludes that the Garbrecht and Bristol–Myers samples are the same cefadroxil monohydrate, then defendant argues either (1) that plaintiff changed the process to such a degree that Garbrecht cannot be considered prior art, or (2) that seeds from defendant's cefadroxil monohydrate in the atmosphere account for the identity of the

Garbrecht sample produced by IBI and the Bristol–Myers material.

### a. *Identity of the Cefadroxil Monohydrate Samples*

The Court will first consider the report prepared by Professor Coda, upon which defendant now relies heavily. Professor Coda found certain differences between the published Bristol–Myers x-ray diffraction pattern for its cefadroxil monohydrate and the pattern for what Coda called the IBI Standard, which represents a composite of some thirty samples of cefadroxil monohydrate produced according to the IBI Patent. Coda, in a separate experiment, concluded that the diffraction pattern for the Garbrecht sample provided to him by IBI was equivalent to the diffraction pattern for the IBI Standard. Defendant argues that since Coda found Garbrecht to be the same as the IBI Standard, while finding the IBI Standard distinguishable from the Bristol–Myers pattern, then as a matter of logic the Garbrecht sample must be distinguishable from the Bristol–Myers product.

While this transitive theory has a certain appeal, the Court finds a number of weaknesses in defendant's argument. First, after the recantation of the Clardy declarations, the conclusion drawn from the Coda report rests only on the assertion of counsel. The Court notes that Coda did not himself reach the conclusion that the Garbrecht sample's diffraction pattern was distinguishable from the Bristol–Myers pattern; he did not undertake that comparison. In contrast, plaintiff has presented the declaration of Professor Lewin, who has reviewed Coda's report and concludes that the differences identified by Coda between the Bristol–Myers pattern and the IBI Standard pattern are not a sufficient basis for distinguishing the two materials. Lewin Decl. I at ¶ 4. Lewin concludes that "there is no material difference in the x-ray diffraction patterns" for the Garbrecht sample, the IBI Standard sample and the reported Bristol–Myers sample. *Id.* The

charts comparing the peak d-values for each of the cefadroxil monohydrate samples clearly supports this conclusion, and the Court agrees.

Defendant certainly could not hope that this Court finds that their conclusion as to the Coda data is correct. If the IBI material is in fact materially different from the Bristol–Myers material, and since it is unrefuted that Kalipharma does not make its own cefadroxil monohydrate, but receives it from IBI, then it would be logical to conclude that the introduction of the IBI product by Kalipharma into the market would not infringe the Bristol–Myers Patent. Indeed, the only conclusion that Professor Clardy maintains is his opinion that the Sample T he tested is identical to the Bristol–Myers product. Clardy Decl. III at ¶ 5; *see* Clardy Decl. I at ¶ 8. It is not disputed that this Sample T is the IBI product; therefore, based on Clardy's own opinion, the IBI product is the same as the Bristol–Myers product. This conclusion is consistent with Professor Lewin's opinion. Accordingly, the Court finds by clear and convincing evidence that the IBI Patent product is identical to the Bristol–Myers Patent product. Using the logic of defendant's argument, though with different facts, the Court can conclude that the Garbrecht sample produced by IBI, which is admittedly identical to the IBI Patent cefadroxil monohydrate, is not materially different from the Bristol–Myers Patent.[14]

### b. *Variances in the IBI Procedure*

Plaintiff must now contend with defendant's second line of attack. Defendant argues, based on the declaration of Professor Danishefsky, that the IBI researchers who purportedly repeated Example 7 of the Garbrecht Patent introduced radical modifications in the procedure not taught by the prior art nor reasonably apparent to one with ordinary skill in the art at the time the

---

**14.** These facts sufficiently establish that defendant is likely to succeed on the infringement prong of its claim, which need only be established by a preponderance of the evidence.

*Smithkline Diagnostics, Inc. v. Helena Lab Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988). The parties have not contested this point.

Garbrecht Patent was obtained.[15] Specifically, defendant argues that IBI used too much hydrochloric acid and too high a temperature. Danishefsky stated that the use of concentrated hydrochloric acid was not the appropriate modification to the Garbrecht example, and that one skilled in the art would not normally use such a technique. Instead, Danishefsky recommends the use of anhydrous acids such as triflouroacetic acid and formic acid. Professor Kosak explains that Danishefsky's challenge to the use of additional hydrochloric acid is unfounded. According to Kosak, the Garbrecht Patent specifically calls for the use of hydrochloric acid with zinc as the reagents needed to remove "protecting groups" introduced in the process. Kosak then states that "the amount of reagent to be used for such 'deprotection' necessarily depends on the number of protecting groups which need to be removed." Kosak Decl. II at ¶ 8. He comments that anyone skilled in the art would customarily employ an excess of reagent in these types of experiments. Id. at ¶ 9. Additionally, he states that examples 1 and 2 of the Garbrecht Patent only involve one protecting group, whereas example 7 involves two, thus requiring larger amounts of reagent. Id. Professor Micetich performed example one using the proper amount of reagent, but failed to increase it properly in performing example 7. Id. The Court agrees with Kosak's analysis. Although it is undisputed that the alternate, anhydrous acids are commonly used to remove protecting groups, it is equally appropriate first to attempt to perform the experiment using varying quantities of the suggested reagent. Danishefsky, whose credibility as an expert has been tarnished, merely stated that using larger quantities of HCl is the "less advisable" approach, Danishefsky Decl. at ¶ 8(c), and this critique does not indicate that one skilled in the art would not have used a larger ratio of HCl under these conditions.

Kosak also comments on Danishefsky's challenge to the higher temperature used by Farina by noting that, contrary to Danishefsky's statement, Farina first obtained cefadroxil at the specified temperature of 20°C, and then increased the temperature to 55°C to increase the yield. Id. at ¶ 11 (citing Farina's Report, attached to his declaration, at 4–5). Kosak contends that "increasing the temperature for the purpose of speeding up the reaction and improving yield is in any event a standard procedure obvious to one skilled in the art and is in no sense a significant departure from the Garbrecht patent." Id. Danishefsky stated that the IBI work indicates that cefadroxil monohydrate was not obtained until the temperature was raised to 55°C. Danishefsky Decl. at ¶ 11. The Farina Report directly contradicts this conclusion.

The Court finds that the variations made by Farina in attempting to reproduce the Garbrecht Patent were obvious to those persons with ordinary skill in the art. The Court thus rejects defendant's argument that Farina's procedures constituted a marked departure from the teachings of the prior art.

### c. *The Seeding Theory*

The last factor to consider is the seeding theory advocated by defendant as an explanation for Farina's ability to reproduce the new cefadroxil monohydrate. The evidence on this issue is not particularly well-developed since defendant submitted the Lipscomb testimony only in its last set of papers. More importantly, the Court finds that the evidence does not support defendant's theory to the extent they argue. It is unclear what defendant claims the Garbrecht Patent would produce *absent* the presence of seeds of the claimed cefadroxil monohydrate. Micetich explains in his second declaration that his attempts to repeat the Garbrecht procedure yielded cefadroxil, though not the cefadroxil claimed in the patent application. Micetich Decl. II, at ¶ 7. The Court cannot discern whether the cefadroxil Micetich obtained was a less stable crystalline form that would by its na-

---

**15.** Danishefsky concentrated his argument on the "radical" use of silica gel column chromatography. This argument has since been disputed by Farina by noting that, contrary to Danishefsky's statement, Farina first obtained credited in light of Micetich's use of the same technique, and only Danishefsky's secondary arguments remain.

ture crystallize into the more stable "new" cefadroxil monohydrate claimed in the Bristol–Myers Patent. This lack of showing renders the seeding theory irrelevant. If the cefadroxil produced by Micetich was not the less stable crystalline form, then, accepting the seeding theory, the presence of seeds from the "new" cefadroxil monohydrate would apparently not affect the compound.

Even if the cefadroxil produced were the less stable form, the Court would have very serious reservations and would not conclude as defendant does. First, Professor Lipscomb admitted that "the seeding mechanism is a little speculative and very, very hard to prove. Yet, the phenomenon itself has appeared so many times that it, by itself, is convincing whatever the explanation." Transcript of Testimony before Judge Debevoise, attached as Exhibit B to Lipscomb Decl. ("Tr."), at 394. He also stated that the earlier, less stable form could be replicated under the proper conditions, namely by running the experiment in a seed-free environment. *Id.* at 398, 403. The Court understands his testimony to mean that, as a theoretical matter, seeding may occur under certain circumstances, but not others. Nothing in his testimony concerned the specific experiments at issue in this case, however.

Second, the Patent Examiner and the Board of Appeals rejected this same seeding theory. Weber described that because of local seeding he could not reproduce the less stable forms of cefadroxil in his laboratory. The Board stated that this conclusion did not disprove the Patent Examiner's conclusion. The applicants then turned to Professor Micetich to attempt to repeat Garbrecht. Professor Prigogine concluded that Professor Micetich's laboratory at the University of Alberta would not be contaminated with seeds of the "new" cefadroxil monohydrate since cefadroxil had not been previously produced there, and on that basis concluded that the experiments run would be reliable. This position was necessary since the applicants argued that Garbrecht could not produce the crystalline cefadroxil monohydrate in question, even in the absence of seeds. If Prigogine's state-

ment is true, as defendant argued before the Patent Examiner at the time it received patent approval, then it is equally true that Professor Cainelli's laboratory at the University of Bologna, where the Garbrecht sample was also obtained, would not be contaminated since he too indicates that he had not previously produced cefadroxil. Cainelli repeated the experiment performed by Farina and obtained the same results. The Court finds defendant's seeding argument unfounded on the record before the Court.

The Court notes that Judge Debevoise, based on the information presented, reached a contrary conclusion. *Biocraft Laboratories v. Bristol–Myers Co.*, No. 89 Civ. 0158 (DRD), Tr. at 465 (D.N.J. February 24, 1989). Judge Debevoise faced a different set of facts, since the party challenging the patent's validity based its arguments on another prior art, not Garbrecht. Although a scientist had been able to reproduce the prior art after the "new" cefadroxil monohydrate had been introduced, he had not been able to do so earlier. Based on these facts, Judge Debevoise gave particular credence to the seeding theory. *Id.* Judge Debevoise ordered the parties to conduct additional experiments to determine the accuracy of the seeding theory, and this Court is of course interested in the outcome of those experiments.

3. Conclusion

The Court concludes, for the reasons stated above, that plaintiff has established a prima facie case of invalidity and that defendant has not rebutted it. Plaintiff has presented clear and convincing evidence that its scientists have replicated the claimed cefadroxil monohydrate according to the terms of Garbrecht Example 7, using only state of the art modifications. Garbrecht thus anticipates the Bristol–Myers claim. The Court has not accepted defendant's only remaining challenge, that seeds from its cefadroxil monohydrate acted as a template such that any attempt to repeat Garbrecht Example 7 anywhere in the world would yield Bristol–Myers cefadroxil monohydrate, for the reasons stated. Ac-

cordingly, defendant has not established that plaintiff is likely not to succeed in challenging the Bristol–Myers Patent.

### Irreparable Harm

■ Each side has submitted evidence and arguments concerning the irreparable harm each would face if they were not to prevail. Defendant is not entitled to a presumption of irreparable harm since it has not established likelihood of success on the merits. *Cf. Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1271–72 (Fed.Cir. 1985) (irreparable harm presumed if validity and infringement clearly established). Defendant has established, however, that it is likely to lose a significant share of the market for this drug if generic competitors are allowed access. The cost will be in the millions of dollars. Defendant has also argued that Kalipharma has relatively small amounts of sales and may not be able to compensate defendant for its losses in monetary damages. Kalipharma is not insolvent, and it has noted that the sales from cefadroxil monohydrate alone will be sufficient to compensate defendant for its damages. Gray Decl. at ¶ 16. The Court agrees.

Finally, plaintiff argues that defendant's delay in seeking preliminary injunctive relief undermines its claim to irreparable harm. Significant delay rebuts an inference of irreparable harm. *Hybritech, supra*, 849 F.2d at 1457. In the present case, plaintiff argues that defendant unreasonably delayed seven months, from the time that the action was filed, until the time defendant sought the TRO. Defendant does not deny that it knew that plaintiff was actively taking steps to market cefadroxil monohydrate. It is not clear whether or not defendant's claimed irreparable injury would be "immediate", as is required, until such time that an infringer was actually ready to produce or market the infringing goods. *See Roper, supra,* 757 F.2d at 1273 (fear of future infringement is not basis for preliminary injunctive relief). The Court does have some skepticism, however. First, defendant never moved to dismiss for lack of subject-matter jurisdiction, the defense it claimed instead of counterclaiming for infringement. Second, in the New Jersey action involving Biocraft, defendant appears to have moved more expeditiously in seeking injunctive relief. The combination of these factors lead the Court to conclude that defendant would not irreparably be harmed if Kalipharma were to enter the market at this time.

### Balance of Hardships

The Court appreciates that the losing party may effectively be precluded from this market. The evidence indicates that the expected life span of this antibiotic will be only a few years, and past experience suggests that this type of litigation could take nearly that length of time. Since it is the nature of litigation that one party wins and one loses, this factor does not weigh heavily in either party's favor. Each side has invested time and money into the development of marketable cefadroxil monohydrate, though defendant, on an absolute level, has spent much more. Nonetheless, this loss will be a very small percentage of defendant's overall revenue, whereas plaintiff's potential loss would represent a far greater percentage of its sales. The weight given to defendant's loss is strongly colored by whether the patent upon which Bristol–Myers relies is valid. Since the patent has been challenged, the Court discounts the weight it might otherwise give to defendant's reliance on its patent.

### Public Interest

Each side has set forth convincing arguments that the public interest favors its victory. Defendant has recited the virtues of patent monopoly, the incentive it gives to research and development, and has described the loss to the public of its continued research into further uses for this cefadroxil monohydrate. Plaintiff has described the cost benefits to the public of generic drugs, allowing for lower health-care costs and wider distribution.

Of course, public policy favors enforcement of valid patent rights, including the right to exclude others. *Smith Int'l, supra*, 718 F.2d at 1581. The key word here is "valid", however, and in this case plaintiff has strongly and convincingly challenged the patent's validity. In *Smith*

*Int'l* the Court held that a "court should not be reluctant to use its equity powers once a party has so clearly established his patent rights." *Id.* The converse is also true, that a court should be cautious to use its equity powers when a challenger has so clearly challenged the patent's validity.

CONCLUSION: Balance of Factors

The single most important issue in this case concerns the validity of the Bristol–Myers Patent. The Court has determined that the prior art has been reproduced and that the claimed invention was therefore anticipated and not novel. The Court has carefully considered defendant's explanations and challenges, and finds them less than persuasive. With the patent's validity called into question so strongly, the other relevant factors become less significant. The Court has considered each, however, and finds that none of them so strongly tilts in defendant's favor to make issuance of a preliminary injunction appropriate. For the reasons stated in this opinion, defendant's application for a preliminary injunction is denied.

SO ORDERED.