**SYNBIOTICS CORPORATION,**
Plaintiff,

v.

**HESKA CORPORATION, Defendant.**

No. 98–CV–2076WCGA.

United States District Court,
S.D. California.

Sept. 8, 2000.

Stewart's critique, which the Court found persuasive.

Stephen J. Rosenman, Paul J. Andre, Lisa Kobialka, Brobeck, Phleger & Harrison, Palo Alto, CA, for plaintiff.

Robert H. Sloss, Todd P. Blakely, Robert R. Brunelli, Mountain View, CA, for defendant.

## ORDER INVALIDATING CLAIMS 1 AND 6 OF U.S.PATENT NO. 4,789,631

WHELAN, District Judge.

Before the Court is a motion for partial summary judgment filed by Defendant Heska Corporation, seeking to establish that Claims 1 and 6 of United States Patent No. 4,789,631 are invalid under 35 U.S.C. § 102(b). Defendant Heska contends that Claims 1 and 6 are anticipated by a prior art reference. Plaintiff Synbiotics Corporation opposes. All parties are represented by counsel. The Court has read and considered the papers submitted, all relevant exhibits and the applicable law. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a). For the reasons stated below, the Court **GRANTS** Defendant's motion for summary judgment.

### I. BACKGROUND

This lawsuit involves products and technology used to detect the presence of heartworm, a potentially fatal immune disease, in cats, dogs and hounds. "Heartworm," which scientists refer to as *Dirofilaria immitis or D. immitis*, is a microorganism that, when it invades an animal, resides in the heart of a dog or cat and can cause a potentially fatal disease. The invention claimed in United States Patent No. 4,789,631 ("the '631 Patent") issued to Plaintiff Synbiotics Corporation ("Plaintiff" or "Synbiotics") describes technology and teaches an invention to detect the presence of heartworm infections in dogs and cats. (*See*

Decl. of Carol Talkington Verser ("Verser Decl.") ¶ 3).

## A. OVERVIEW OF THE RELEVANT TECHNOLOGY

After *D. immitis* invades an animal, it secretes substances toxic to the host animal. The animal's immune system recognizes the microorganism and its secreted substances as foreign. (*Id.* ¶ 3). The grouping of numerous molecules making up *D. immitis* or the substances it secretes are referred to as "antigens." Antigens—even those from the same microorganism—come in various shapes and *D. immitis* consists of many differently shaped antigens. The antigens of one microorganism may have shapes different from the shapes of antigens of other microorganisms. (*Id.* ¶ 4). These antigens will elicit the animal's immune system to produce antibodies, which are proteins produced to fight infection. (*Id.* ¶ 3). The antibodies released in response to an infection will recognize the antigenic sites on that microorganism and will have a binding affinity for such sites. ('631 Patent, col. 1, lns. 18–21).

Antigens and antibodies are chemically related, in that a given antigen stimulates the production of an antibody. The produced antibody recognizes the specific shape of the antigen and binds to that shape forming a "complex" between the antigen and antibody. The binding of antibodies to antigens can be analogized to a key fitting into a lock: if the key is the right shape, it will fit into the lock; if the key is not of the right shape, it will not fit into the lock. Similarly, if an antibody corresponds to the shape of (or fits with) a given antigen, the antibody will bind to the antigen; but, if a particular antibody does not fit with an antigen, it will not bind to that antigen. An antibody that binds to an antigen is said to be "specific" to that antigen. (Verser Decl. ¶ 5).

When an animal makes antibodies in response to *D. immitis* infection, the animal produces a mixture of antibodies to different *D. immitis*. (*Id.* ¶ 6). Another microorganism, however, can have antigens that resemble antigens from *D. immitis* because the antigens from other microorganisms have shapes similar to that of *D. immitis*. The resemblance can be great enough that an antibody produced to recognize an antigen from *D. immitis* (the "target microorganism") will also recognize antigens from the other microorganism. Such an antibody is said to "cross-react" with the second, non-target microorganism. Similarly, an antibody produced to recognize an antigen belonging to a non-target microorganism may also recognize an antigen of *D. immitis* if the antigen of *D. immitis* is of a similar shape to the non-target microorganism's antigen. Cross-reactivity can cause problems in diagnostic tests because it can lead to "false positives," where a positive reaction which is thought to indicate the presence of the *D. immitis* could, in reality, indicate the presence of a non-target microorganism. (*Id.* ¶ 7).

The concept of cross-reactivity has relevance here because of a second parasitic microorganism that resides in the intestines of dogs, *Toxocara canis (or T. canis)*. In most cases, a *T. canis* infection is relatively benign. However, some antibodies that ire generated against a *T. canis* antigen can cross-react with a *D. immitis* antigen and produce false positives in a test to detect *D. immitis* infection. (*Id.* ¶ 8).

## B. SYNBIOTICS' PATENT

On February 17, 1984 Edward T. Maggio filed the initial application for what eventually became the '631 Patent. On December 6, 1988 the Patent and Trademark Office awarded Maggio United

States Patent No. 4,789,631, which was subsequently assigned to Synbiotics. The '631 Patent contains eight claims, only two of which, Claims 1 and 6, are the subject of this motion. Claims 1 and 6 of the '631 Patent disclose an assay and assay reagent that is sensitive to the presence of *D. immitis* but insensitive to the presence of *T. canis*. The advantage of the disclosed assay and assay reagent is the lack of a false positive result.

## C. HESKA'S PRODUCTS

Like Synbiotics, Heska sells two heartworm diagnostic products, one for dogs and another for cats. Heska also provides diagnostic services using two other products. Two of the products are known as "point-of-care" tests, in that they allow veterinarians to conduct in-house tests to determine within minutes whether the subject animal has heartworm infection. Heska's diagnostic services require veterinarians to collect animal blood samples which are then forwarded to Heska for laboratory testing. Both Heska's point-of-care and heartworm diagnostic tests use antigen detection assays.

## D. THIS ACTION

On November 12, 1998 Synbiotics commenced this action asserting a single claim for patent infringement. On December 27, 1999 Heska brought this motion for partial summary judgment seeking a determination that Claims 1 and 6 are anticipated by two prior art references. Synbiotics filed its opposition on January 10, 2000 and Heska filed its reply on January 19, 2000. On August 28, 2000 the Court requested both parties to provide additional briefing on the narrow enablement issue. On September 1, 2000 the parties timely submitted their supplemental memoranda. The Court thereafter took the motion under submission and issues this order without oral argument pursuant to Civil Local Rule 7.1(d.1).

## II. LEGAL STANDARD

A district court may grant summary judgment in a patent case as in any other type of case, *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir.1985), when here is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R.CIV.P. *56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2553. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non-moving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

█ Where, as here, the moving party will bear the burden of persuasion at trial on an affirmative defense, it cannot obtain summary judgment by relying on its opponent's inability to produce evidence to support its claims. Rather, a party moving for summary judgment on an issue over which it bears the burden of proof must make an affirmative showing so compelling that no rational jury would fail to award

judgment for the moving party. *See, e.g., Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 35 (1st Cir.1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive."). If the moving party fails to meet this initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970).

Once the moving party meets this initial burden, however, the non-moving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, all inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus., Co.,* 475 U.S. at 587, 106 S.Ct. at 1356. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."

*Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Rule 56(a) and (b) provide for "summary adjudication of claims," also called "partial summary judgment." Partial summary judgment is appropriate when, employing the standards articulated above, no genuine issue of material fact exists as to a particular claim. When there is no such issue of fact, the court may grant summary judgment in the party's favor "upon all or any part" of a claim. *See* Fed.R.Civ.P. 56(a), (b).

## III. DISCUSSION

Heska moves to establish that a prior art reference render Claims 1 and 6 invalid due to anticipation. To prevail on its motion, Heska must demonstrate that no genuine issues of material fact exist as to whether the prior art reference anticipates Claims 1 and 6 of the '631 Patent. Synbiotics opposes the motion primarily by attacking the scientific validity of Heska's prior art reference. The Court will address each of these issues in turn.

### A. LEGAL STANDARD—ANTICIPATION

Patents enjoy a statutory presumption of validity. *See* 35 U.S.C. § 282. Patent claims may be invalidated, however, where an alleged infringer proves by clear and convincing evidence that a prior art reference "anticipates" the invention. 35 U.S.C. § 102(b); *Applied Medical Resources Corp. v. U.S. Surgical Corp.,* 147 F.3d 1374, 1378 (Fed.Cir.1998); *Medtronic Inc. v. Intermedics, Inc.,* 799 F.2d 734, 741 (Fed.Cir.1986). A patent is "anticipated" by a prior publication and therefore invalid if "the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

■ Invalidity by anticipation results if each and every element of the claimed invention appears in a single reference published more than one year before the filing date of the challenged patent. *Scripps Clinic & Research Fnd. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir. 1991); *Verdegaal Brothers Inc. v. Union Oil Company of California*, 814 F.2d 628, 631 (Fed.Cir.1987). While every element must appear in a single reference, additional references may be used to reveal what it would have meant to those skilled in the art at the time of the invention. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 727 (Fed.Cir. 1984).

As the party asserting invalidity, Defendant bears the burden of establishing by clear and convincing evidence facts which support the ultimate legal conclusion of invalidity under 35 U.S.C. § 102(b). *Checkpoint Sys., Inc. v. Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed.Cir.1995). Moreover, for a summary determination of anticipation to be proper, there must be no genuine dispute that the prior art reference discloses each and every limitation of the claim. *See Hazani v. Int'l Trade Comm'n*, 126 F.3d 1473, 1477 (Fed.Cir.1997).

**B. THE DISPUTED PORTIONS OF CLAIMS 1 & 6**

Heska alleges that Claims 1 and 6 of the '631 Patent are anticipated by two prior art references. Synbiotics counters that neither piece of prior art discloses the crucial element of non-cross-reactivity to anti-*T. canis* antibody.

■ Claims 1 and 6 both qualify as *Jepson*[1] or improvement claims. The use of *Jepson* claims is authorized by 37 C.F.R. § 1.75(e), which permits a preamble to recite "elements or steps of the claimed in-

vention which are conventional or known." *See* 37 C.F.R. § 1.75(e). When a *Jepson* claim is employed, "the claimed preamble defines not only the context of the claimed invention, but also its scope ... [T]he claimed invention consists of the preamble in combination with the improvement." *Pentec Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed.Cir.1985). The Patent and Trademark Office has adopted this view. The *Jepson* claim "is to be considered a combination claim. The preamble of this form of claim is considered to positively and clearly include all the elements or steps recited as part of the claimed combination." M.P.E.P. § 608.01(m).

In the preamble, Claim 1 discloses an assay for detecting anti-*D. immitis* antibody (hereinafter "anti-DI Ab"), the improvement of which is to discriminate to anti-*T. canis* antibody (hereinafter "anti-TC Ab") and anti-DI Ab. Claim 1 reads in its entirety:

> In an assay for detecting anti-Dirofilaria immitis antibody in a serum sample, the assay including the following steps:
>
>> step (a): contacting the serum sample with an immunoassay reagent having soluble antigenic components of Dirofilaria immitis attached thereto for binding the anti-Dirofilaria immitis antibody, and then
>>
>> step (b): detecting the anti-Dirofilaria immitis antibody bound to the immunoassay reagent,
>
> wherein an improvement enables the antibody assay to discriminate between the detection of anti-Toxocara canis antibody, the improvement comprising:
>
>> in said contact step (a) and said detection step (b), the soluble antigenic components of Dirofilaria immitis which are attached to the immunoas-

---

1. The reference to Jepson claims comes from *In re Jepson*, 1917 C.D. 62, 243 O.G. 525 (1917), where the Assistant Commissioner of

Patents approved of the use of claims disclosing an improvement.

say reagent consist essentially of non-cross-reactive antigenic subcomponents which are reactive with anti-Dirofilaria immitis antibody and are *non-cross-reactive with anti-Toxocara canis antibody,* and

said reaction step (b) being insensitive to the presence or absence of anti-Toxocara canis antibody.

('631 Patent, Col. 11, lns. 31–53) (emphasis supplied). In turn, Claim 6 of the '631 Patent reads as follows:

In an immunoassay reagent for use in an antibody assay for detecting anti-Dirofilaria immitis antibody in a serum sample, the immunoassay reagent including:

a solid phase carrier and

soluble antigenic components of anti-Dirofilaria immitis, said antigenic components being attached to said solid phase carrier for binding and immobilizing anti-Dirofilaria immitis antibody,

wherein an improvement enables the antibody assay to discriminate between the detection of anti-Dirofilaria immitis antibody and the detection of anti-Toxocara canis antibody, the improvement comprising:

said soluble antigenic components consisting essentially of non-cross-reactive antigenic subcomponents which are reactive with anti-Dirofilaria immitis antibody and *non-cross-reactive with anti-Toxocara canis antibody.*

('631 Patent, Col. 12, lns. 36–54) (emphasis supplied). Heska contends that a prior art reference discloses each and every element of Claims 1 and 6. Heska offers a 1978 paper published by two Australian scientists, John S. Welch and Colin Dobson as evidence of anticipation.

Significantly, Synbiotics does not dispute that Heska's prior art reference discloses each and every element of the preamble of Claims 1 and 6. Moreover, with the exception of the *non-cross-reactivity with anti-DI Ab* element, Synbiotics does not dispute that Heska's references discloses each and every element of the improvement. By not providing any evidence or argument as to these issues, Synbiotics has essentially conceded that the remaining elements included in Claims 1 and 6 are disclosed by the prior art reference. The Court will therefore confine its analysis to: (1) whether the prior art reference discloses the *non-cross-reactivity with anti-TC Ab* element, and (2) whether the references enables a person of ordinary skill in the art to use the disclosure.

## C. WELCH DISCLOSES CLAIMS 1 AND 6 OF THE '631 PATENT

■ In 1978, Australian scientists John S. Welch and Colin Dobson published a paper entitled *Immunodiagnosis of parasitic zoonoses: comparative efficacy of three immunofluorescence tests using antigens purified by affinity chromatography.* See Transaction of the Royal Society of Tropical Medicine and Hygiene, Vol. 72, No. 3, pp. 282–288, 1978 (hereinafter "Welch") (Supp.Decl. of Ann M. Hoffman). Synbiotics questions the relevance of this disclosure primarily by attacking its scientific merit. As discussed below, however, the issue here is not whether Welch has scientific merit, but whether Welch discloses the *non-cross-reactivity with anti-TC Ab element.*

Heska contends Table 1 of Welch discloses the *non-cross-reactivity with anti-TC Ab* element. (Supp.Decl. of Ann M. Hoffman at 284). In Table 1, Welch reports the results of various tests, including (1) three normal rabbits, (2) three rabbits sensitized to *D. immitis,* and (3) three

rabbits sensitized to *T. canis.* (*Id.*). The table reads in pertinent part:

| Origin of serum | Number tested | Serum | Reciprocal antibody titre 'Pure' antigen Di | Reciprocal antibody titre 'Pure' antigen Tc |
|---|---|---|---|---|
| Immunized Rabbits | 3 | Normal | 14 | 13 |
| | 3 | Di sensitized | 107 | 8 |
| | 3 | Tc sensitized | 19 | 149 |

For the three rabbits with sera sensitized to *D. immitis,* Welch reports (1) high titer levels of D. immitis and (2) low titer levels of *T. canis.* (*Id.*). Similarly, for the three rabbits with sera sensitized to *T. canis,* Welch reports (1) high titer levels of *T. canis* and (2) low titer levels of *D. immitis.* (*Id.*).

Additionally, the same table reports (1) the basal results of three non-infected human subjects, (2) the results of three human subjects infected with *D. immitis,* and (3) the results of two human subjects infected with *T. canis.* (*Id.*):

| Origin of serum | Number tested | Serum | Reciprocal antibody titre 'Pure' antigen Di | Reciprocal antibody titre 'Pure' antigen Tc |
|---|---|---|---|---|
| Zoonotic human infection | 3 | Non-infected | 7 | 11 |
| | 3 | Di infected | 298 | 21 |
| | 2 | Tc infected | 24 | 256 |

For the three human subjects infected with *D. immitis,* Welch reports (1) high sera titer levels of *D. immitis* and (2) low sera titer levels of *T. canis.* (*Id.*). Similarly, for the two human subjects infected with *T. canis,* Welch reports (1) high sera titer levels of *T. canis* and (2) low sera titer levels of *D. immitis.* (*Id.*). Welch's assay and assay reagent, therefore, appear to disclose the ability to detect the presence of anti-DI Ab while simultaneously not providing false positive readings against anti-TC Ab.

Synbiotics argues that Welch does not anticipate Claims 1 and 6 because Welch does not use the terms "reactive" and "non-cross-reactive" in discussing his results. (Pl.'s Opp'n at 3:22–24). This argument lacks merit. Although Welch does not employ the words "reactive" and "non-cross-reactive," Welch explicitly reports that the tests "gave strong specific positive reactions." (Supp.Decl. of Ann M. Hoffman, at 285, col. 1, lns. 56–58). Similarly, the '631 Patent explains that "[t]he assay result is positive if serum antibody is found to bind to the antigenic material. However, unless precautionary steps are taken, the positive result of an assay, can be, in fact, a false positive." ('631 Patent, col. 1, lns. 33–36). The patent continues in the following paragraph to explain that "cross-reactive antibody is a product of an immunogenic response to a non targeted microorganism, i.e., a microorganism which is different than the microorganism to which the assay is targeted." (*Id.,* at col. 1, lns. 37–41). The thrust of the '631 Patent is to disclose a test that reacts with anti-DI Ab and does not cross-react with anti-TC Ab,

in other words, to disclose a test that provides specific positive results while simultaneously excluding false positive results. The Court concludes that the slight difference in terminology employed by Welch and the '631 Patent lacks legal significance; both clearly refer to the same immunological occurrences.

The Court also agrees with Heska that Welch inherently discloses the *non-cross-reactivity with anti-DI* element of Claim 6. Welch describes the assay reagent used in these experiments as consisting of "pure antigen-coupled Sepharose 4B beads." (Supp.Decl. of Ann M. Hoffman, at 285, col. 1, lns. 3–35, 5). Heska contends that (1) the Sepharose 4B beads are equivalent to the "solid phase carrier," and that (2) the pure antigen is similar to the "soluble antigenic components of anti-DI," as required by Claim 6. Heska also argues that the pure antigen attached to the Sepharose 4B beads is used to test infected sera, thereby also satisfying the requirements of Claim 6. Synbiotics does not dispute these assertions, nor could it. As described above, the Welch assay, just as the assay reagent, consists essentially of non-cross reactive antigenic subgroups that are reactive with anti-DI Ab and non-cross-reactive with anti-TC Ab.

Based on the undisputed evidence before it, the Court finds that Welch discloses the *non-cross-reactivity with anti-TC Ab* element of Claims 1 and 6 because the test described in Welch can detect levels of anti-DI Ab while simultaneously not showing significant anti-TC Ab reactivity. Therefore Welch discloses an assay and assay reagent for detecting anti-DI Ab in a serum sample and the steps include the challenged element—*non-cross-reactivity with anti-TC Ab*. Welch discloses each and every element of Claims 1 and 6.

Synbiotics presents various arguments in opposition, none of which the Court finds persuasive. First, Synbiotics argues that the data Welch reports in Table 1, from naturally infected dogs, demonstrates that the assay disclosed cannot be used to selectively detect the presence of *D. immitis* in dogs without cross-reacting with *T. canis*. (Pl.'s Opp'n at 7:5–18). Synbiotics' argument does not, however, negate the fact that Welch demonstrates efficacy when testing sera from sensitized rabbits and infected human subjects. Nothing in Claims 1 or 6 requires that the assay or assay reagent be specifically conducted *on naturally infected dogs*, or, more generally, on naturally infected subjects. Although Synbiotics may have drafted the '631 Patent with an emphasis towards heartworm diagnosis of naturally infected dogs, no such limitation appears in Claims 1 and 6. Synbiotics' argument therefore lacks merit.

As its second argument, Synbiotics contends that Welch employs circular logic by using the same antibodies for both purification and subsequent testing, reflecting a lack of independence of the antibodies involved. (Pl.'s Opp'n at 5:5–6:18). This scientific argument may be appropriate when considering a paper for publication in a scientific journal. However, it lacks legal relevance to the issue of whether Welch discloses each and every element of Claims 1 and 6. Nothing in Claims 1 and 6 requires the *non-cross-reactivity with anti-TC Ab* element to be lacking in "circular logic," because the Welch assay and assay reagent nonetheless disclose the critical *non-cross-reactivity with anti-TC Ab* element of Claims 1 and 6. Additionally, Claims 1 and 6 do not require independent antibodies for purification and subsequent testing. In assessing whether Welch anticipates Claims 1 and 6, the Court declines to impose an independent antibody limitation which does not appear in the claims.

Finally, Synbiotics asserts that there are fundamental scientific flaws in Welch. Synbiotics suggests that Welch never established whether the rabbit serum really contained anti-TC antibodies. (Pl.'s Opp'n at 4:12–5:4). This argument fails on two grounds: (1) the issue at hand is a legal as opposed to a scientific matter and (2) even if Welch had such a fundamental scientific flaw, it would not prevent anticipation of Claims 1 and 6.[2] First, these fundamental flaws may be appropriate arguments to be raised when a proposed paper is reviewed for its scientific merits. This argument, however, just as the previous arguments Synbiotics champions, asks this Court to review Welch, after the fact, on its scientific merits. Because the editors of the *Transaction of the Royal Society of Tropical Medicine and Hygiene* were satisfied that the Welch results were worthy of publication, the Court will not now contradict their expert opinions.[3] Second, even if Welch had a fundamental flaw, it would not prevent anticipation of Claims 1 and 6, neither of which even mentions dogs. As discussed above, data from human subjects demonstrate that the Welch assay and assay reagent anticipate Claims 1 and 6; these subjects were not infected artificially. (*See* Supp.Decl. of Ann M. Hoffman at 282) at This makes Synbiotics' argument unconvincing.

### D. WELCH IS AN ENABLING DISCLOSURE

Heska further asserts, and Synbiotics disputes, that Welch is enabling.

#### 1. THE LAW OF ENABLEMENT

■ "To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject mat-

ter." *PPG Industries, Inc. v. Guardian Industries Corp.*, 75 F.3d 1558, 1566 (Fed. Cir.1996); *see also Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986); *In re Epstein*, 32 F.3d 1559, 1569 (Fed.Cir.1994). The disclosure must be enabling such that it "describe[s] the [inventor's] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention." *In re Paulsen*, 30 F.3d 1475 (Fed.Cir.1994) (citing *In re Spada*, 911 F.2d 705, 708 (Fed.Cir.1990) (holding that the claims were properly rejected by the PTO because they were anticipated by a prior art reference)). Judge Learned Hand has commented:

No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teachings will sometimes succeed and sometimes fail if it does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge and it is not an anticipation.

*Dewey & Almy Chem. Co. v. Mimex Co.*, 124 F.2d 986, 990 (2d Cir.1942) (Hand, J.). "The invention need not describe every last detail that would make the invention work. It may omit principles well known to those of ordinary skill; it need only describe enough information to allow one of ordinary skill in the art to make the invention work... Resolution of this threshold issue will allow the fact finder to determine objectively whether the claim

---

**2.** Although this argument may have some probative value as to whether Welch is an enabling disclosure, it lacks relevance as to whether Welch discloses each and every element of Claims 1 and 6.

**3.** The Court notes that Synbiotics' expert, Dr. Ming M. Wong, has published four research papers in this same journal.

was anticipated, rather than focusing on the subjective ability of the inventor to use the prior art reference in creating his or her invention." *Ex parte Naujoks,* 17 U.S.P.Q.2d (BNA) 1537, 1540 (Bd.Pat.App. & Interf.1989). The accused infringer "has established a prima facie case of invalidity ... [by showing] that its scientists have replicated the claimed [invention] according to the terms of [an example in a prior art reference], using only state of the art modifications." *Kalipharma Inc. v. Bristol–Myers Co.,* 707 F.Supp. 741, 755 (S.D.N.Y.1989).

## 2. DEFENDANT RELIES ON INAPPLICABLE LEGAL AUTHORITY

In seeking to establish enablement, Heska erroneously relies on the district court's decision in *Mehl/Biophile Int'l Corp. v. Milgraum,* 8 F.Supp.2d 434, 444 (D.N.J. 1998), *aff'd on other grounds,* 192 F.3d 1362 (Fed.Cir.1999) for the proposition that the Court may presume that prior art references are enabling. (Def.'s Reply at 3:20–27). Decisions relied upon by the district court in *Mehl/Biophile Int'l Corp.,* however, articulated a rule applicable *only* to parties prosecuting patent applications before the PTO. *See, e.g., In re Sasse,* 629 F.2d 675, 681 (Cust. & Pat.App.1980) (holding that when PTO cites disclosure that expressly discloses invention disclosed in patent application, applicant has the burden to show lack of an enabling disclosure). Once a patent has issued, as here, the statutory presumption of validity attaches and shifts the burden to the alleged infringer to show, by clear and convincing evidence, that the prior art discloses *and* enables the claims. *See, e.g., Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1576 (Fed. Cir.1996) (holding that alleged infringer asserting invalidity bore burden of proof on *all issues* relating to anticipation).

## 3. HESKA'S ARGUMENT SUPPORTING ENABLEMENT

Heska provides four grounds why Welch enables: (1) methods described in Welch were subsequently used by other scientists, (2) declarations by Welch's co-author and two other experts show that Welch is enabling, (3) declaration from the editorial journal that published Welch stating that all publications must enable others to replicate the methods described, and (4) a plethora of articles cite Welch.

First, Heska presents an article authored by Chuan–Min Yen and Eng–Rin Chen entitled *Detection of antibodies to Angiostrongylus cantonensis in serum and cerebrospinal fluid of patients with eosinophilic meningitis. See International Journal of Parasitology,* Vol. 21, No. 1, pp. 17–21, 1991 (Supp.Decl. of Ann M. Hoffman) (hereinafter "Yen"). Heska contends that Yen proves that Welch is enabling. In the Materials and Methods section of Yen, the authors reveal they followed the Welch method when preparing *A. cantonensis* antigens. Heska notes that Yen's reference and incorporation of the Welch method, standing alone, demonstrates Welch's enablement.

Second, Heska provides several declarations, all of which attest to Welch's enablement at the time of its publication. Welch's co-author Dr. Colin Dobson (Decl. of Colin Dobson at 4:1–25) and Dr. Dwight D. Bowman, an associate professor at Cornell University (Decl. of Dwight D. Bowman at 4:10–28), both attest to Welch's enablement. This opinion is also shared by Dr. Mario T. Philipp, chair of the Department of Parasitology at Tulane University. (Decl. of Mario T. Philipp at 4:10–12; 4:18–21; 5:10–13; 5–16–26). All these scientists, as persons of ordinary skill in the art, declare that Welch enables.

Third, Heska provides the declaration of Dr. Douglas C. Barker. Barker chairs the

Royal Society of Tropical Medicine and Hygiene's editorial board. According to Barker, the Society's journal always requires that submitted articles contain information sufficient for others to replicate the methods described. (Decl. of Douglas C. Barker at 2:11–16). Barker concludes that because this policy has always been rigorously enforced, Welch enables. (*Id.* at 2:17–22).

Finally, Heska submits eight articles citing Welch after its publication in 1978. (Decl. of Ann Hoffman; Exhibits 3–10). Each article cites Welch either in the introduction or discussion section of the publication. Heska contends these eight approving references to Welch, since its publication, demonstrate enablement.

The Court finds that Heska has carried its initial burden by providing evidence that (1) another in the field of immunology has relied on and followed the methods disclosed by Welch and (2) persons of ordinary skill in the art claim that Welch is enabling.

### 4. SYNBIOTIC'S ARGUMENTS REGARDING ENABLEMENT

Synbiotics counters that Welch fails to enable because: (1) Welch contains internal inconsistencies, (2) Welch's statistical analysis is subjective, (3) the immunofluorescence assay's negative controls are uncertain, and (4) Welch fails to specifically reveal how the animals were immunized.

### (A) THE PURPORTED INTERNAL INCONSISTENCIES IN WELCH

Synbiotics first argues argument that Welch is internally inconsistent with respect to the antigen preparation method. However, Synbiotics presents no evidence that anyone who attempted to replicate Welch found these alleged inconsistencies disabling. In addition, Synbiotics' argument fails in light of Yen's proven success in employing the Welch methodology. Re-

markably, despite these alleged "internal inconsistencies," Yen makes no mention of struggling with Welch's disclosures.

### (B) WELCH'S ALLEGED SUBJECTIVE STATISTICAL ANALYSIS

Synbiotics next argues that much of Welch's statistical analysis is subjective and poorly described. However, Synbiotics' statistical arguments are inconsequential in light of Yen's success. In order for Welch to enable, it must provide sufficient information so that one of ordinary skill in the art may perform the disclosure. *See In re Paulsen,* 30 F.3d at 1475; *see also Naujoks,* 17 U.S.P.Q.2d. at 1540. As noted above, Yen and Chen successfully deployed Welch's method in reaching their results. It strains credulity that Synbiotics would require this Court to mandate that Welch teach statistical analysis. There is overwhelming evidence establishing that a person of ordinary skill in the art in 1978 could have relied on Welch, repeated the disclosed method, while using different statistical analysis. (Decl. of Ann Hoffman; Exhibits 3–10). If anything, the '631 Patent offers less guidance than Welch regarding statistical analysis of the compiled data. Therefore, the Court rejects Synbiotics' tenuous argument that Welch employed a "subjective statistical analysis."

### (C) UNCERTAINTIES REGARDING IMMUNOFLUORESCENCE ASSAY

Synbiotics next suggests that Welch's immunofluorescence assay's negative controls contain uncertainties which prevent enablement. (Decl. of Theodore Sand ("Sand Decl.") ¶¶ 13–18). Assessment of fluorescence always depends on subjective evaluation of signal intensity. (*Id.* ¶ 14). Here, Synbiotics asserts that the uncertainties in Welch are a result of (1) the

lack of negative controls and (2) the subjective evaluation of signal intensity.

Sand's (Synbiotics' expert) argument that Welch lacks negative controls is not supported by the evidence. Welch's Table 1 clearly discloses that each category's first measurement (immunized rabbits, natural infections, and zoonotic human infections) are the controls. Welch's guidance on this aspect of the experiment could not have been more clear. Absent any evidence to support Sand's assertion to the contrary, the Court rejects Synbiotics' claim that Welch is not enabling for lack of negative controls.

Sand next argues the Welch fails to disclose sufficient enabling information on (1) background staining patterns, (2) background staining intensity and (3) procedures to determine a "titer." (*Id.* ¶ 15). Again, Welch "need not describe every last detail that would make the invention work. It may omit principles well known to those of ordinary skill; it need only describe enough information to allow one of ordinary skill in the art to make the invention work." *Naujoks*, 17 U.S.P.Q.2d at 1540. As evidenced in Sands' declaration, a person of ordinary skill in the art would *already know* that negative controls usually emit some fluorescence and background staining patterns, their intensity and the procedure to determine a "titer" are all important considerations when performing immunofluorescent assays. (Sand Decl. ¶¶ 14, 15). For example, an article authored by Indira Kharat, S.N. Ghirnikar and B.C. Harinath, *Immunofluorescence studies with Wuchereria bancrofti microfilariae ES antigen,* employed a similar immunofluorescence method as Welch. *See Indian Journal of Medical Research,* Vol. 78, pp. 497–502, October 1983 (Decl. of Ann Hoffman) (hereinafter "Kharat"). Taken together, the undisputed facts that (1) a person of ordinary skill in the art would have known how to perform an immunofluorescence assay and (2) evidence that other scientists have conducted the similar assays described in Welch (e.g. Kharat), wholly invalidates Synbiotics' assertions to the contrary.

**(D)** *The Method of Animal Immunization*

Lastly, Synbiotics argues that Welch's failure to specifically describe how his animals were immunized prevents enablement. Synbiotics contends that a person of ordinary skill in the art would be compelled to engage in undue experimentation in attempting to replicate Welch.

Plaintiff's *own expert* provides no less than *nineteen* exhibits illustrating the different methods one of ordinary skill in the art could have employed in 1978 to immunize rabbits. (*See* Sand Decl, Exs. B–T). According to Sand, there were at least five "basic approaches" to inject rabbits and mammals with antigens: (1) intradermal, (2) intravenous, (3) intramuscular, (4) subcutaneous and (5) intraperitoneal. (*See Id.* at 1:21–25). Because this information was readily available to one of ordinary skill in 1978, Welch absolutely provided sufficient immunization information to enable. This is particularly true because the results discussed in Welch would have been virtually identical regardless of the immunization method employed. Obviously, the only variable factor would be the concentration of antibodies produced in the immunized animals. The underlying immunological response would remain the same.

Welch may not have been enabling had the immunization methods not been well known. Immunization's chief purpose is to infect an animal with microorganisms which compel the production of antibodies specific to the infecting microorganism. Sera are then collected from the animals for further experiments. In many respects, it does not matter how the animals are immunized. What does matter is that

immunization occurs and that the animals produce antibodies specific to the invading microorganism.[4] Welch clearly discloses this. The Court concludes that one of ordinary skill in the art in 1978 could have chosen a different method, from the many available, to immunize the animals—and reached the same or similar results. Therefore, Welch did not need to disclose that which was already known in the art.

The Court finds that Heska has provided clear, convincing and undisputed evidence that Welch is an enabling disclosure.

### E. ANTICIPATION BY ACCIDENT

■■■ Finally, Synbiotics argues that Welch never intended to prepare a DI Ab assay, such that Welch only anticipated "by accidentally." (Pl.'s Opp'n at 8:4–6). "The mere fact that a certain thing may result from a given set of circumstances is insufficient to prove anticipation." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268–69 (Fed.Cir.1991) (quoting *In re Oelrich*, 666 F.2d 578, 581 (Cust. & Pat.App.1981)). An accidental or unwitting duplication of an invention cannot constitute an anticipation. *See Tilghman v. Proctor*, 102 U.S. 707, 711, 12 Otto 707 (1880); *Eibel Process Co. v. Minnesota and Ontario Paper Co.*, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923). However, the doctrine of accidental anticipation requires true fortuitousness, to wit—a chemical's unexpected production to no one's knowledge. *See Tilghman*, 102 U.S. at 721, 12 Otto 707. As Judge Learned Hand once stated:

It is quite true that an accidental use will not anticipate a process, if the earlier practiser was not aware of what he was doing, or how he did it. His work must give some assurance that the result can be reached another time, and of this there can be none unless the process is deliberate and the means understood. Nothing else can be called an art; it is merely an accident ... But when the result is a necessary consequence of what was deliberately intended, it is irrelevant that it was then valueless for the purposes in mind. Were that enough to prevent anticipation, it would be possible to patent a new use for an unchanged process, which is never true.

*H.K. Regar & Sons v. Scott & Williams*, 63 F.2d 229, 231 (2d Cir.1933) (citation omitted) (Hand, J.).

Here, Welch certainly knew that he was comparing three methods to determine the assay sensitivity to antibodies produced in response to one parasite without cross-reacting to antibodies produced in response to another. Welch compared three assays and used four parasite pairs that cross-reacted: *D. immitis* and *T. canis* as one pair and *A. cantonerisis* and *A. lumvricoides* as the other pair. This purpose-producing a test that will not give false positive results-was apparent in the "Discussion" portion of Welch. In the second paragraph, Welch declares that "[t]hese data showed that antigens purified by affinity chromatography, which removed antigens that *cross-react* with antibodies raised against selected parasites, have greatly improved specificity compared with 'crude' parasite antigen extracts." (Supp. Decl. of Ann M. Hoffman, at 287, col. 1, Ins. 36–41 (emphasis added)). Based on this undisputed evidence, it is clear Welch knew that they were disclosing an assay and assay reagent that taught the *non-cross-reactivity with anti-DI* element of

---

4. Synbiotics would not have this or any other Court limit the scope of the '631 Patent to assay and assay reagents that are employed in conjunction with animals that were immun-ized by the specific method described in the specifications of the '631 Patent. This further underscores the fact that Welch need not disclose a specific immunization method.

**1212**

Claims 1 and 6. There was no anticipation by accident in Welch.

**IV.** CONCLUSION AND ORDER

In light of the foregoing, the Court **GRANTS** Heska's motion for partial summary judgment. (Doc. No. 91–1). The Court concludes that Claims 1 and 6 of United States Patent No. 4,789,631 are invalid as a matter of law under 35 U.S.C. § 102(b). Both claims are anticipated by a prior art reference: J.S.D. Welch and C. Dobson, *Immunodiagnosis of parasitic zoonoses: comparative efficacy of three immunofluorescence tests using antigens purified by affinity chromatography, Transaction of the Royal Society of Tropical Medicine and Hygiene,* Vol. 72, No. 3, pp. 282–288, 1978.

**IT IS SO ORDERED.**